IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILL O. KING, | : | |
| | : | **JURY TRIAL DEMANDED** |
| Plaintiff, | : | |
| | : | **CIVIL ACTION FILE NO.** |
| v. | : | **1:15-CV-0583-TWT** |
| KYLEMA JACKSON, | : | |
| Individually and in his Official | : | |
| Capacity as a City of Atlanta | : | |
| Police Officer, and | : | |
| THE CITY OF ATLANTA | : | |
| Defendants. | : | |

## PLAINITFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF ATLANTA'S MOTION TO DISMISS AND INCORPORATED BRIEF IN SUPPORT

PLAINTIFF WILL O. KING files this, his Response and Brief In Opposition To Defendant City of Atlanta's Motion To Dismiss.

### I.   INTRODUCTION

On April 4, 2013, Defendant Kylema Jackson, a now-former City of Atlanta Police ("APD") Officer, shot Will King in the face through his car window, without provocation or justification. See generally, Complaint, ECF 1.  King was unarmed and shot point blank while he sat lawfully in his car.  He was hospitalized in critical condition, continues to undergo numerous surgeries, is permanently disfigured and

[1]

has incurred over half a million dollars in medical expenses.

On February 27, 2015, King filed this suit against Jackson in his individual and official capacity, as well as the City of Atlanta ("the City") for violations of 42 U.S.C. § 1983 *et. seq.* and Georgia law. Consistent with *Canton v. Harris*, 489 U.S. 378 (1989) and its progeny, Plaintiff's Complaint articulated the City's deliberately indifferent failure to adequately train and/or supervise Defendant Jackson, which caused Jackson to violate Will King's constitutional rights. See, *Gold v. Miami* 151 F3d 1346,1350 (11th Cir. 1998).

Under *Canton*, there are two potential routes to a asserting such a claim. First, "it may happen that in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers' deliberate indifference to the constitutional rights of others may be inferred. *Canton,* 489 U.S. at 390. Second a plaintiff may present evidence of a pattern of prior constitutional violations of which a municipality is aware such that the municipality's choice not to take action constitutes deliberate indifference to the constitutional rights of its citizens. See generally *Gold*, 151 F.3rd 1346. Because the failure to train and supervise concerned use of force, both methods of municipal liability were pled.

[2]

In *Canton*, the Supreme Court gave an example of obvious need for more or different training:" where "city policy-makers know to a moral certainty that their police officers will be required to arrest fleeing felons and where officers have been armed "in part to allow them to accomplish this task, there exists a "need to train officers in the constitutional limitations on the use of deadly force." *Canton,* 489 U.S. 378 n. 10.

The immediate Complaint references 12, and details 5, incidents in which citizens formally complained about Jackson and gave the City notice of his violent tendencies and excessive use of force. His personnel records include: threatening to pull his weapon to intimidate a motorist on a routine traffic stop, substantiated by 2 eyewitnesses; Complaint ¶ 54-57; exhibiting "bizarre" behavior which caused APD supervisors to fear that he might shoot them or others Id. at ¶¶ 58-73; pulling his weapon without provocation on unarmed citizens, including an off-duty female police officer, substantiated by that officer and 6 other witnesses. (The off-duty officer complained to the City that Jackson used excessive force and needed use of force training), Id. at ¶¶ 75-84; injuring a teenager who was attempting to aid her blind grandmother, and then when confronted, appearing at his door with gun in hand, wearing only underwear, Id.at ¶¶ 110-120; starting an angry confrontation with an off

[3]

duty APD officer and 2 State Troopers, Id at ¶¶ 85-98; and unnecessarily punching and pepper spraying a citizen and delaying medical treatment to "teach him a lesson". Id. at ¶¶ 103-109. His unconstitutional use of excessive force and intimidation went virtually unchecked by the APD, which had the effect of condoning and encouraging continued misconduct. Jackson's reign of terror culminated in the shooting of an unarmed man (King), after the obvious need to discharge, meaningfully discipline or effectively train him, went unheeded by the City.

Despite the well-pled Complaint, the City filed a Motion to Dismiss alleging failure to state a claim. See, ECF No. 4. It is undisputed that since suit was filed, Jackson pled guilty to criminal charges stemming from his unlawful shooting of King. The City says he "resigned" from the force. Documents released by the City thus far, pursuant to Open Record Requests, show Jackson's pattern of excessive force, and a disregard for the constitutional rights of others, as well as the City's knowledge and ratification of his conduct. (Other records were withheld from Plaintiff as criminal charges were pending against Jackson.)

## II.    STATEMENT OF FACTS

On the afternoon of April 4, 2013, Will King and three passengers were

[4]

traveling in Atlanta and stopped at a CITGO. Complaint at ¶¶ 11,12,13. One passenger exited to make a purchase from the store. Id.   Mr. King and two others stayed in the vehicle. Id. at ¶ 14. Defendant Jackson pulled his APD patrol car into the CITGO and stopped beside King's car. Id. at ¶ 15.  Jackson backed up behind the car, and activated his blue lights. Id. at ¶ 16.  Jackson exited his vehicle with his service weapon drawn and pointed at Mr. King. Id. at ¶ 17.  He approached the driver's side with his weapon continually pointed at King's head. Id. at ¶ 18. Jackson yelled for the occupants to raise their hands; they all complied, including King. Id. at ¶ 19. Despite compliance, Jackson used unjustified and excessive deadly force by firing a bullet through the driver's side window, striking an unarmed Mr. King in the side of the face. Id. at ¶ 20.  King, after suffering a massive head injury and fearing for his life, managed to drive to where he was taken to the hospital with life threatening injuries. Id. at ¶ 21.

Defendant Jackson did not know the identity of anyone in Mr. King's car at the time he exited his vehicle with his service weapon drawn and fired though the window, striking King in the face. Id. at ¶¶ 23-25.  Neither Mr. King, nor anyone in the vehicle, did anything to cause Jackson to reasonably believe they posed an immediate threat of physical violence to him or others, or possessed a weapon. Id. at ¶¶ 28, 30. Prior to exiting his vehicle with his gun drawn, Jackson had no articulable suspicion or

[5]

probable cause to believe King or the occupants had committed any felonies; nor did he witness any felonies. Id. at ¶¶ 31-34.  Because Jackson had no reason to believe anyone in the vehicle posed an immediate threat, or possessed a weapon, Jackson violated the U.S. Constitution when he improperly used excessive deadly force by shooting King. Id. at ¶ 30. Prior to shooting King, Jackson was charged with the knowledge that the use of excessive deadly force by a peace officer is an unlawful seizure of a person under the U.S. Constitution and Supreme Court case law. Id. at ¶¶ 29, 44, 25.

During his employment with the APD, Jackson received no less than 12 citizen complaints, many involving unnecessary use of force. Id. at ¶ 49.  About 15 days before Jackson shot Mr. King, the APD had sustained an unnecessary use of force complaint against him. Id. at ¶ 51. Yet, he remained armed and on patrol without restrictions when he shot King.

Despite Jackson's history of unnecessary force complaints, the City continued to employ him as a police officer. Id. at ¶ 52. Through its actions and inactions, the City established a process or custom that allowed and encouraged Jackson to continue to illegally use excessive force. Id.

The City was aware, as early as 2004, that Jackson was willing to use

[6]

unnecessary force by using his service weapon, as a citizen complained that he gestured threateningly to use his weapon during a routine traffic stop. Id. at ¶ 54. The citizen and two witnesses provided statements to the APD regarding Jackson's actions. Id. at ¶ 56. APD investigated and despite the unnecessary use of force, characterized it as a sustained "lack of courtesy" complaint against Jackson and merely gave him an oral admonition. Id. at ¶ 57.

In 2005, Jackson was instructed by a supervisor to walk a beat. Id. at ¶ 59. APD records show Jackson refused saying: "[I] don't walk foot beats, it goes against [my] principles and [my] manhood." Id. at ¶ 60. During the investigation of the charge of job abandonment, a Sergeant and front line supervisor for a dozen years, interviewed Jackson with another Sergeant. Id. at ¶¶ 62, 63. The interviewing Sergeant opined that Jackson was mentally unstable. Id. at ¶ 63. He expressed concern that if Jackson was as unstable as he appeared, whether he [the Sergeant] should be worried about his personal safety and the safety of others. Id. at ¶ 64. He stated he had never encountered an employee who behaved like Jackson and that Jackson made him, an armed APD supervisor, **fear for his life**. Id. at ¶ 65. The Sergeant said Jackson refused to look him in the eye, and instead stared off into space as though talking with someone above him. Id. at ¶ 66. When asked if he was going to continue to refuse the assignment and

disobey orders, Jackson said nothing, and continued to gaze into space. Id. at ¶ 67.

After Jackson had left the building, *both* Sergeants expressed concern to one another **that Jackson might reach for his weapon and use it**. Id. at ¶ 69. One Sergeant was so concerned when he became aware that he was not wearing his bulletproof vest, he "subconsciously" placed his hand on his own weapon. Id. at ¶ 70. The interviewing Sergeant opined that Jackson "clearly exhibited behavior indicative of psychological and/or emotional impairment." Id. at ¶ 71. He requested Jackson be relieved of duty and scheduled a psychiatric evaluation. Id. at ¶ 72. Jackson was relieved from duty on 5/25/2005 and was reinstated shortly thereafter by APD for full duty on 7/14/2005. Id. at ¶¶ 73, 74.

In November 2005, Defendant Jackson, without any complaint, approached a group of motorcycle riders at a BP station. Id. at ¶76. The social riding group gathered briefly to coordinate taking photos at a near-by park. Id. at ¶ 77. Unbeknownst to Jackson, one of them was an off duty police officer. Id. at ¶ 78. Jackson pulled in and began cursing and demanding they exit the premises. Id. at ¶ 79. Though they were trying to leave, **Jackson pulled his service weapon in a hostile and intimidating manner**. Id. at ¶ 80. Seven (7) people, *including the off duty officer*, complained to APD. Id. at ¶ 81.

[8]

In her statement to APD, the off duty officer opined that Jackson used unnecessary and excessive force and recommended counseling on use of force. Id. at ¶ 82. Several other complainants urged more training or counseling. Id. at ¶ 83. Despite complaints and statements provided by the victim/witnesses, the APD initially deemed it only another "courtesy violation", later changed to "**exonerated.**" Id. at ¶ 84. The City again refused to train Jackson on use of force or counsel him on his violence toward the public; it refused to discipline him proportionate to and commensurate with his offense.  Instead, through its inaction, the City taught Jackson that unnecessarily pulling his weapon on unarmed citizens, including a fellow officer, carried no consequences and was not even considered "discourteous."

On August 28, 2007, Defendant Jackson was working near Lakewood Amphitheater. Id. at ¶ 86. Another APD officer and two State Troopers were also working off duty security at the amphitheater. Id. at ¶¶ 87, 88. According to the complaining APD officer, Jackson became "irate" due to the location of cars before the gates opened. Id. at ¶ 89. The officer asked Jackson to calm down, as he was raising his voice to her and the crowd. Id. at ¶ 90. The State Troopers also saw Jackson's aggressive behavior. Id.  Once the gates opened, Jackson entered in his patrol vehicle with blue lights flashing, and blocked traffic. Id. at ¶ 91. One Trooper asked Jackson

[9]

when he was going to move for traffic. Id. at ¶ 92.  Jackson argued with the Trooper and said he would move "when he got ready to move". Id. at ¶ 93. The Trooper walked away to deescalate the confrontation. Id. at ¶ 94.

For the second time, an off duty officer filed a complaint with APD against Jackson. Id. at ¶ 95.   The APD Investigative Procedure, Policy or Training Recommendations stated as follows:

> "The attendance of a sensitivity course by Officer Jackson might assist him, when dealing with citizens and other law enforcement. This has not been the first instance in which a complaint has been received about Office Jackson's attitude and courtesy toward others. ***Without some form of training, this type of situation will continue, and cause unforeseen problems for the department and Officer Jackson.***" (Emphasis Added) Id. at ¶ 98.

On February 6, 2008, Jackson was charged with, and later admitted, sending angry "profane messages" to an APD co-employee ("Shut up bitch" to a dispatcher who was concerned when she could not raise him on the radio). Id. at ¶ 100-101. The investigating Sergeant stated: **"the fact that Officer Jackson makes these blatant violations of [SOP] is a sign of Officer Jackson's obvious unconcern with the position he holds."** (Emphasis Added.) Id. at ¶ 102.

[10]

Later in 2008, Jackson arrested a man for drinking in public. Id. at ¶ 104. The man complained to APD that **Jackson had sprayed him with pepper spray and punched him**. Id. Jackson took the man to a road-block for transportation to jail. Id. at ¶ 105. The road-block was about a half mile from the arrest and should have taken less than 2 minutes to transport. Id. at ¶ 106. Jackson took 40 minutes to get the man there and additional 10 minutes before telling the officer at the road-block that he had pepper sprayed him. Id. at ¶ 107. **Jackson told the officer at the road-block that he did not call for medical assistance because he "<u>wanted to teach [the victim] a lesson.</u>"** (Emphasis Added) Id. at ¶ 108. The APD investigation noted that Jackson had done this same type of thing in the past, and recommended counseling. Id. at ¶ 109.

Jackson took an unauthorized job as a "courtesy officer" at an apartment complex. Id. at ¶ 111.  On November 12, 2012, Jackson was accused of using unnecessary force when he grabbed a blind tenant's granddaughter to remove her from the property; she was there to assist her grandmother. Id. at ¶ 112. The report said Jackson bruised the girl's arm when he forced her from the complex, on foot, in the rain. Id. at ¶ 113.  When the girl's mother arrived at the complex, she found her daughter outside in the rain. Id. at ¶ 114. The girl and her mother went to Jackson's apartment to discuss the event. Id. at ¶ 115. **Jackson came to the door brandishing a**

[11]

**handgun in his hand,** wearing only a T-shirt and boxer shorts. Id. at ¶ 116.  The girl's mother call 911 for assistance. Id. at ¶ 117.

The report stated that **Defendant Jackson did not understand that grabbing a person was use of force.** Id. at ¶ 119.  APD eventually sustained an unnecessary force claim against Defendant Jackson, after this event and did so just fifteen (15) days prior to him shooting Will King. Id. at ¶ 120.  Yet, nothing happened to Jackson after the finding to discourage him from again using excessive force such that he was armed with an APD issued weapon, driving an APD patrol car and working, without restrictions, the day he shot King.

## III. LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.   STANDARD OF REVIEW

The City alleges the Complaint fails to state a claim, shows the existence of an affirmative defense, and asserts that the Federal claims against it must be dismissed as there was not a constitutional violation, or if there was, it was not a result of a policy or custom. City Mot. Dismiss at P. 3, 4.

FRCP 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to

[12]

'state a claim for relief that is plausible on its face." *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007). "A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Id.

In reviewing a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir. 2003). A motion to dismiss is only granted when the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harper v. Blockbuster Ent. Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998) (Quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957)).

As the *movant*, the City may not rely on strained inferences or alleged facts in its motion that are not asserted in the complaint. "A court's review on a motion to dismiss is 'limited to the four corners of the complaint.'" *Wilcombe v. TeeVee Toons,* 555 F.3d 949, 959 (11th Cir. 2009). "A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." Id.

## B.   THE COMPLAINT ALLEGES SUFFICIENT FACTS TO SUPPORT THE FEDERAL CLAIMS AGAINST DEFENDANT JACKSON

[13]

The Complaint specifically alleges facts that show a constitutional violation occurred when Defendant Jackson, acting as an APD Officer, under color of law, with no probable cause and in violation of the constitution and law, shot an unarmed Will King in the face. Complaint ¶¶ 7, 8, 20, 28, 30, 31, 41-46.

"There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness of requirement of the Fourth Amendment." *Tennessee v. Garner,* 471 U.S.1, 7, 105 S.Ct. 1694 (1985). An officer's use of excessive force, deadly or not, in the course of an arrest, investigatory stop, or other seizure of a free citizen is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 388, 394, 395, 109 S.Ct. 1865 (1989).

Defendant Jackson violated clearly established laws and rights under the Fourth Amendment and numerous court rulings. In *Vinyard v. Wilson*, 311 F.3d 1340, 1349-1355 (11th Cit. 2002), the Eleventh Circuit recognizes three sources of "clearly established law" that may give fair warning to public officials: (1) obvious clarity in code or law, (2) broad principles in controlling case law; and (3) materially similar facts in such cases. The law applicable to Jackson's unconstitutional conduct was

[14]

present and well known for decades before the shooting of Will King.

The allegations of the Complaint establish that Defendant Jackson, a uniformed APD Officer, improperly and without any lawful reason, shot Will King in the face. Thus, the requirement that a Constitutional violation be sufficiently pled has been met.

## C.    THE COMPLAINT ALLEGES SUFFICIENT FACTS TO SUPPORT THE FEDERAL CLAIMS AGAINST THE CITY OF ATLANTA

The City asserts the Complaint does not allege sufficient facts to render it liable under § 1983. City Mot. Dismiss at P.4. A motion to dismiss mainly tests the sufficiency of the complaint, does not delve into disputes of facts alleged, and the court accepts as true all well-pled factual allegations in the complaint, viewing them in the light most favorable to the Plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008); *Am. United Life Ins. Co. v. Martinez*, 480 F3d. 1043, 1057 (11th Cir. 2007).

A local government may be sued for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell v. Dept. of Soc. Serv. of NY*, 436 U.S. 658, 690, 691, 98 S.Ct.2018 (1978). To assert a claim under § 1983 against a municipality, a plaintiff must show only: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted

[15]

deliberate indifference to that constitutional right; and (3) that policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A complaint against a municipality must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Randall v. Scott*, 610 F.3d 701, 707 n.2 (11th Cir. 2010). Pleading standards require that a plaintiff allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 544. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009).

The Complaint alleges a pattern of the City's failure to stop Defendant Jackson's unconstitutional conduct, such that it had the effect of encouraging him. It also shows that the City adhered to an approach that it knew or should have known would likely result in tortious conduct in the future. In ¶ 52, the Complaint states that despite Jackson's history of unnecessary force complaints, the City continued to employ him as a police officer. Through its actions, and inactions, it established a process or custom that allowed and encouraged him to continue to illegally use excessive force.

"Where it is claimed that an employee was encouraged to act unlawfully by his

[16]

or her recognition that the municipality would not act to stop such conduct, it must be shown that municipality continued to adhere to an approach that it knew or should have known had failed to prevent tortious conduct in the past and was likely to result in such conduct in the future." "The municipality must have acted with deliberate indifference to the known or obvious consequences." *Board of County Comm. of Bryan County, Okla. V. Brown*, 520 U.S. 397 (1997). (P. 5 City Motion)

The Complaint provides at ¶¶ 128, 129 in part that: The City's implementation of the customs, policies and official acts caused the violation of Mr. King's constitutional rights, and reflects its deliberate indifference to the constitutional rights afforded to Mr. King. Such policy, custom, and official acts include, but are not limited to: (a) the City's choice of an inadequate training program, including but not limited to the use of unnecessary deadly force, condoned officers' misconduct, which lead to the violation of the publics' constitutional rights. (See Cpt.: physically gesturing to use weapon during routine traffic stop ¶54-57; pulling weapon on citizens, including an off duty officer ¶75-84; injuring a teenage girl, then brandishing a gun ¶110-120; pepper spraying a citizen and delaying medical treatment to teach him a lesson ¶103-109. )

Jackson violated the constitutional rights of citizens such that the need for further training, control and supervision [particularly in the area of uses of force] was

[17]

plainly obvious to the [APD], who was deliberately indifferent to such need. The City had no meaningful policies or procedures in place, and thereby manifested deliberate indifference to the offensive acts and to the constitutional rights of the public, including Mr. King's, by acts and omissions including but not limited to use of unnecessary deadly force; See Complaint ¶128, 129)

Plaintiff has set forth facts which would put City policymakers on actual notice that omission in Jackson's training and in his retention were substantially certain to result in the violation of the constitutional rights of their citizens. See *City of Canton,* 489 U.S. 378 (1989). Plaintiff has presented evidence of a pattern of prior constitutional violations of which the City was aware such that its choice not to take action constitutes deliberate indifference to the constitutional rights of its citizens. See generally *Gold,* 151 F. 3rd 1346.

Jackson's 2004 act of gesturing threateningly to use his weapon during a routine traffic stop, constituted an unnecessary use of force during an investigatory stop. Cpt. at ¶¶ 54-57. See, *Graham,* 490 U.S. 386 (U.S. 1989). *Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight. *Lee v. Ferraro,* 284 F.3d

[18]

1188, 1197-98 (11th Cir. 2002).  In the course of a routine traffic stop, an officer gesturing as if to draw his gun gives rise to a reasonable fear of the person stopped of receiving a violent injury.  Thus, Jackson violated the 4th Amendment rights of the complainant in using an excessive amount of force in conducting the stop.

In 2005, Jackson violated the 4th Amendment rights of the group of motorcyclists in the incident described in the Complaint.  Cpt. ¶¶ 76-84. There had been no complaint regarding them.   For reasons unknown, he cursed them and demanded they leave the premises.  While they were preparing to leave in compliance with his order, he drew his service weapon on them in a hostile manner.  Jackson violated the 4th Amendment constitutional rights of the all of the motorcyclists, and the off duty officer, in using an excessive amount of force under the circumstances.

In August of 2007, another APD investigating supervisor urged further training when Jackson blew up in anger, without cause, at State Troopers and an off duty APD Officer.  ***"Without some form of training, this type of situation will continue, and cause unforeseen problems for the department and Officer Jackson."*** Cpt. at ¶ 98. No training was given. In February of 2008, another supervisor warned: **"the fact that Officer Jackson makes these blatant violations of [SOP] is a sign of Officer Jackson's obvious unconcern with the position he holds."** (Emphasis Added.) Cpt.

[19]

at ¶ 102. Again, no training or ameliorative action was taken by the City.

Later in 2008, Jackson violated an arrestee's constitutional rights by unreasonably delaying medical treatment for an arrestee after he punched and pepper sprayed, to "teach him a lesson". Cpt. at ¶¶ 104-109. This intentional delay and the reason he offered, demonstrate Jackson's deliberate indifference to the medical needs of the victim. Deliberate indifference to a pre-trial detainee's serious medical needs is a violation of the 14th Amendment guarantee of due process. *Estelle v. Gamble,* 429 U.S. 97 (1976). *Snow v. City of Citronelle, Ala*, 420 F 3d 1262, 1268, (11th Cir. 2005).

In the 2012 incident, Jackson used unnecessary force to remove a teenager from an apartment complex where her blind grandmother lived. Cpt. ¶¶ 111-119. The teenager was on the premises lawfully. Jackson physically removed her from the premises bruising her arm in the process and then stated that he did not even understand that physically grabbing her in that fashion was a use of force. His statement is a clear admission that his use of force training remained deficient. This was an unnecessary use of force and constitutional violation under *Graham supra.*

The City's failure to heed the warning from multiple APD supervisors and other law enforcement personnel inside and outside the APD, or otherwise take action to stop the pattern of unconstitutional use of force, lead to Jackson's shooting the

unarmed Plaintiff in the face while Plaintiff's hands were raised. The policymakers at the Atlanta Police Department were aware of a pattern of prior violations of the constitutional rights of citizens by Jackson and obvious deficiencies in use of force training. Being aware of these constitutional violations and the deficiencies, their failure to train, supervise or discharge Jackson constitutes deliberate indifference to the constitutional rights of its citizens in general and Plaintiff in particular.

### D.     THE CITY DRAWS IMPERMISSIBLE INFERENCES

The City attempts to draw strained inferences from the Complaint which it cannot do by law. "The movant may not rely on inferred or alleged facts in its motion that are not asserted in the complaint." *Wilcombe,* at. 959. The City claims: "Plaintiff acknowledges that the City of Atlanta 'rigorously' investigated each and every one of the complaints." Id. at P. 8. Nothing could be further from the truth. In fact, it is obvious from a reading of the Complaint that it demonstrates the City did anything *but* rigorously investigate or effectively discipline Jackson. For example, it found he committed a mere "courtesy violation" (then later exonerated him) when pulled his weapon without provocation on unarmed citizen group, including an off duty police officer. He was not trained, punished or even admonished for a blatant violation of the use of force continuum. This lack of institutional control regarding unnecessary force

[21]

effectively condoned and inspired Jackson's violence toward the public to continue. It culminated in Jackson's shooting of Will King.

The City had extensive actual knowledge of Jackson's continuing use of unnecessary force, as well as his need of, and lack of, effective use of force training. The City's failure and refusal to meaningfully discipline or adequately train, established a custom that reinforced and encouraged continuation of his unlawful conduct. The City's custom was thus a moving force behind his unconstitutional behavior.

A causal connection between supervisory actions and alleged constitutional deprivation can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant of continued duration, rather than isolated occurrences." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11Cir.1994) (Quoting Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994).

In addition to the custom of ratifying Defendant Jackson's unlawful behavior for a decade, the City failed to properly train him, though repeatedly urged by persons within outside the APD. The inadequacy of training may serve as the basis for § 1983

[22]

liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the governmental officials come into contact. *City of Canton, Ohio v Harris,* 489 U.S. 378, 388 (1989). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as when there exists a history of abuse by [employees] that has put the [municipal defendant] on notice of the need for corrective measures when the failure to train is likely to result in the violation of a constitutional right." *Belcher,* 30 F.3d at 1397-98 (citations omitted). Numerous people urged the APD to train Jackson, as it was obvious he needed use of force training.

Here, the Complaint details a nearly unchecked history of anger, violence and abuse of the citizens with whom Jackson came into contact. "Where it is claimed that an employee was encouraged to act unlawfully by his or her recognition that the municipality would not act to stop such conduct, it must be shown that municipality continued to adhere to an approach that it knew or should have known had failed to prevent tortious conduct in the past and was likely to result in such conduct in the future." *Brown,* 520 U.S. 397 (1997). By virtue of the City's failure to meaningfully discipline, train or take corrective action to remedy Jackson's unconstitutional, aggressive and violent behavior against the public, the City established a custom that

[23]

ratified, condoned and inspired his behavior. The City's custom was a "moving force" behind the shooting of Will King. The Complaint articulates that Jackson was encouraged to act unlawfully by his recognition that the municipality would not act to stop his conduct.  It details that the City's continued adherence to an approach that it knew or should have known had failed to prevent tortious conduct in the past and was likely to result in such conduct in the future.

### E.    SOVEREIGN IMMUNITY DOES NOT BAR PLAINITFF'S STATE LAW CLAIMS AGAINST THE CITY OF ATLANTA

The City moves to dismiss Plaintiff's state law claims based upon sovereign immunity. It claims that it has not waived sovereign immunity as it did not purchase liability insurance. Plaintiff requested proof of insurance from the City of Atlanta on July 31, 2014. The City never responded to the request; therefore, Plaintiff does not possess the requested information. While it is true that "a municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory" Monell, 436 U.S. at 691, a negligence action against the City can proceed where the Plaintiff can show "a direct causal link between a City policy or custom and the alleged constitutional deprivations." Young, 59 F.3d at 1171 (citing City of Canton, Oh. v. Harris, 489 U.S.

[24]

378, 385 (1989)). A plaintiff alleging an unconstitutional city policy may establish the policy either through identification of (1) an officially-promulgated city policy, or (2) an unofficial custom or practice of the city shown through repeated acts of a policymaker. <u>Grech v. Clayton County, Ga.</u>, 335 F.3d 1326, 1329 (11th Cir. 2003). Here, based on the analysis above, Plaintiff Will King has demonstrated the requisite direct causal link between the City's failure and unwillingness to train or discipline regarding the excessive use of force and his unlawful shooting,

WHEREFORE, Plaintiff Prays that the City's Motion to Dismiss be DENIED.

## **CERTIFICATION OF FONT**

This certifies that pursuant to LR 5.1, ND., GA, the above Complaint for Damages has been prepared using Times New Roman font, 14 point.

Respectfully submitted this 3rd day of April, 2015.

/s/_____
**James D. McGuire**
Georgia Bar No. 493325
jmcguire@mcklaw.org

McGuire, Crohan & Klinger
Not A Partnership
1800 Peachtree Street, Suite 514
Atlanta, Georgia 30309
404-351-8500 main line
404-351-8805 facsimile

[25]

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILL O. KING, | : | |
| | : | **JURY TRIAL DEMANDED** |
| Plaintiff, | : | |
| | : | **CIVIL ACTION FILE NO.** |
| v. | : | **1:15-CV-0583-TWT** |
| KYLEMA JACKSON, | : | |
| Individually and in his Official | : | |
| Capacity as a City of Atlanta | : | |
| Police Officer, and | : | |
| THE CITY OF ATLANTA | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2015, I electronically filed a copy of PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF ATLANTA'S MOTION TO DISMISS AND INCORPORATED BRIEF IN SUPPORT with the Clerk of Court using CM/ECF system with service on all attorneys of record for the City of Atlanta electronically. I also hereby certify that since Defendant Kylema Jackson has not provided a method to serve him electronically, I have this day placed a copy in the U.S. Mail, first class, with adequate postage thereon to his address of 1650 Anderson Mill Road, #7103, Austell, GA 30106.

/s/
**James D. McGuire**
Georgia Bar No. 493325
jmcguire@mcklaw.org

[26]